IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
-vs-                               )     No. 21-CR-107-GKF
                                   )
JOHNNY EDWARD MIZE, II,            )
                                   )
                Defendant.         )

TRANSCRIPT OF SENTENCING HEARING

**BEFORE THE HONORABLE GREGORY K. FRIZZELL**

UNITED STATES DISTRICT JUDGE

APRIL 6, 2022

A P P E A R A N C E S

        **Ryan Heatherman,** Assistant U.S. Attorney, 110 West
Seventh Street, Suite 300, Tulsa, Oklahoma, 74119, attorney on
behalf of the Plaintiff;

        **James J. McHugh and Anna K. Christensen,** Federal
Community Defender Office, Capital Habeas Unit, 601 Walnut
Street, Suite 545 West, Philadelphia, Pennsylvania, 19106,
attorneys on behalf of the Defendant.

REPORTED BY:        BRIAN P. NEIL, RMR-CRR
                    United States Court Reporter

1        Wednesday, April 6, 2022

2                    * * * * *

3        **DEPUTY COURT CLERK:**  This is Case No. 21-CR-107-GKF,

4   United States of America v. Johnny Edward Mize, II.  Counsel,

5   please state your appearances for the record.

6        **MR. HEATHERMAN:**  Ryan Heatherman for Reagan

7   Reininger on behalf of the United States.

8        **THE COURT:**  Good afternoon.

9        **MR. HEATHERMAN:**  Good afternoon, sir.

10       **MR. MCHUGH:**  Good afternoon, Your Honor.  Jim McHugh

11  on behalf of Johnny Mize.

12       **MS. CHRISTENSEN:**  Good afternoon, Your Honor.  Anna

13  Christensen on behalf of Mr. Mize.

14       **THE COURT:**  Good afternoon.  Mr. Mize, two questions

15  as we begin.  First of all, did you receive a copy of the

16  written presentence investigation report -- the most recent

17  revision was March 29th -- in a timely fashion?

18       **THE DEFENDANT:**  Yes, sir.

19       **THE COURT:**  Secondly, have you had a full, fair, and

20  complete opportunity to discuss the contents of that report

21  with your attorneys?

22       **THE DEFENDANT:**  Yes, Your Honor.

23       **THE COURT:**  Very well.  Counsel, are there any

24  objections to the presentence report or issues with regard to

25  the sentencing guidelines.

1          MR. HEATHERMAN:   No, Your Honor.

2          MR. MCHUGH:   No, Your Honor.

3          THE COURT:   The court grants the government's motion

4    for a third-level reduction for acceptance.   That motion's

5    found at docket No. 45.   With that third-level reduction, the

6    total offense level in this case is a 26.   Mr. Mize's criminal

7    history category I, the lowest category.   The term of custody

8    under the statute is not more than 15 years; under the

9    guidelines, the term of custody ranges from 63 to 78 months.

10         The term of supervised release under the statute is not

11   more than three years; under the guidelines, it ranges from one

12   to three years.   The term of probation under the statute is not

13   less than one year nor more than five.   The defendant is

14   ineligible for probation under the guidelines.

15         The fine under the statute is not more than $250,000;

16   under the guidelines, the fine ranges from $25,000 to $250,000.

17   Restitution is not ascertainable.   And we have a special

18   monetary assessment of $100.

19         Are there any objections to any of those findings?

20         MR. HEATHERMAN:   No, Your Honor.

21         MR. MCHUGH:   No, Your Honor.

22         THE COURT:   Mr. McHugh, I'd be pleased, sir, to hear

23   any statements that you have on behalf of Mr. Mize.

24         MR. MCHUGH:   Thank you, Your Honor.   Good afternoon,

25   Your Honor.   Johnny Mize has accepted responsibility and is

1    remorseful for his actions.  On July 4th, 2017, he woke up and

2    went to work at the fireworks stand that was literally on his

3    parents' property never imagining that he would harm someone

4    that day.  He would do anything to take that back, his actions

5    during that brief few stressful seconds that resulted in Jake

6    Ulrich's death.  He can't do that, though.  But since those

7    moments have passed, I would ask the court to look at a few

8    things that he has done since that moment.

9          Immediately after this incident, this crime occurred,

10   he cooperated fully with the police.  He went to the police

11   station and gave a full videotaped statement concerning his

12   actions.  That day he did that, along with his father, Johnny,

13   Sr., who also gave a full statement.  He told the police that

14   he fired his gun.  He told the police that he had heard a shot

15   fired in his direction.  He fully admitted to firing his

16   firearm.  He did not deny that.  He was eventually charged by

17   the state and granted bail.  While on bail over a year awaiting

18   trial in the state, he was a model citizen.  He worked and he

19   remained arrest-free.

20         After that, he was convicted and incarcerated.  Then

21   that charge was dropped under the *McGirt* decision and the

22   federal courts lodged charges.

23         What has he done in federal court?  As the court just

24   granted the motion, he has accepted responsibility in a timely

25   fashion by pleading guilty to the charges against him.  Each

1   step of the way, Your Honor, since these frantic moments has

2   been Johnny Mize showing you the person he is.  While he's been

3   in custody on the federal charges -- you have just handed up to

4   Your Honor -- and I'm sorry it came in a little late -- but a

5   letter from Samantha Workman who shows that he's been a model

6   prisoner during his time at Cimarron.  She indicates that she

7   doesn't write letters very often for inmates, and she took it

8   upon herself to write this letter because Johnny has been such

9   an exemplary inmate during that time.

10      He's in a program, the inmate work program, which you

11  don't get into just because you apply.  They look at your

12  overall behavior and your discipline in the institution.  Not

13  only is he in that program, he's remained in that program.

14      She has said that she has seen a lot of inmates come

15  and go during her time, and she indicates that she's aware of

16  people that would be likely to recidivize.  She doesn't see

17  Johnny Mize fitting that mold at all.

18      Your Honor, I do want to take a moment to -- so those

19  are the actions I ask you to consider he's done since this time

20  up to today.  But I also want to kind of compare his actions to

21  the actions of the individuals -- the individual who

22  perpetrated this robbery, Mr. Jack Ulrich, who was the older

23  individual of the two.

24      He, when he came to that fireworks stand on that day on

25  July 4th, had two open charges in different counties for

1    firearm offenses.  He had two prior convictions for violent

2    offenses involving firearms, and he was there that day not as a

3    juvenile, which he brought his cousin along, Jake, obviously

4    tragically, but he was 27 years old on that day.  When this

5    incident occurred and this crime took place, he didn't turn

6    himself in, like Johnny Mize did, and talk to the police.  He

7    fled and he remained on the run for three days.

8         When he finally turned himself in, Your Honor, he

9    insisted -- while he was on the run, he called his grandmother

10   and the first thing in the statement they took from the grandma

11   was, "We didn't have a gun.  We didn't shoot."  That's the

12   first thing he says to his grandma.

13        Then when he gets interviewed by the police in the same

14   room where Johnny Mize had been three, four days earlier, the

15   first thing he says in his statement to the police is, "I

16   didn't have a gun.  I didn't fire at anybody."  And I ask Your

17   Honor to take into consideration those actions with the actions

18   of Johnny Mize.

19        I would also ask the court to -- I just respectfully

20   disagree with a couple points that were made in the

21   government's response to our motion, if I may, Your Honor, at

22   this time.  The government indicates, just kind of to clarify

23   the record, that Mr. Jake Ulrich did not have facial hair and

24   they support that with Exhibit A, which is an undated photo of

25   Mr. Ulrich.  I would just note, Your Honor, the information we

1    received was from the autopsy in this case which indicated a

2    goatee and a mustache for Jake Ulrich and also that he was

3    6-foot-2-inches tall.

4          Also, Your Honor, the government talks about how two

5    boys grabbed the fireworks describing Jack Ulrich as a boy.  I

6    just want to emphasize, Your Honor, that we disagree.  We

7    certainly don't disagree that Jake Ulrich at 15 years was a

8    juvenile, but we do disagree that Jack should be described as a

9    boy.  He was 27 at the time of this incident.  He had already

10   served five years in the adult Oklahoma state prison for the

11   offenses that I previously mentioned.

12         The government also makes mention that every witness

13   says they only heard two shots.  The issue in this case went

14   back and forth in front of the state court jury as to whether

15   or not there were three shots or two shots and who heard what

16   and who heard it when.  But I would suggest, Your Honor, that

17   not every witness said that they only heard two shots.  There

18   were witnesses that said they heard three bangs, and that the

19   key witness, which is Jack Ulrich, who testified did not

20   confirm that Johnny Mize stood over the truck and fired at him.

21   He did not confirm that in his testimony.  Certainly the shot

22   that Johnny Mize fired hit Jake Ulrich but not this so-called

23   second shot.  So we do take issue with that.

24         And we do note, Your Honor, that in the presentence

25   report that's before this court the statement of facts does not

1   indicate or does not state that Johnny Mize fired a second shot

2   into the gun -- into the truck and that the government did not

3   object to that statement of facts as before this court.

4           We don't submit Jack Ulrich's criminal history here to

5   somehow imply that Johnny Mize knew about all this when he was

6   working at that fireworks stand.  We don't submit it for that.

7   What we do submit it for, though, Your Honor, is for the

8   reasonableness of Johnny Mize when he says he heard a gunshot

9   and that's why he fired.  Because the court can decide whether

10  or not this individual, who insists that he did not have a gun

11  and did not fire a shot, is really being truthful given his

12  criminal history.  We are not trying to insinuate that Johnny

13  Mize somehow knew about that.

14          So I just wanted to bring those points up respectfully,

15  Your Honor, given that the response was filed yesterday and we

16  would have responded in writing but it was a little quick.

17          **THE COURT:**  No.  It's appropriate.

18          **MR. MCHUGH:**  Thank you.  Your Honor, so obviously

19  under 3553(a) you're looking at the facts and circumstances of

20  the offense.  But I would like to also say that, you know, the

21  fact and circumstances of this offense really took place in a

22  matter of seconds, but please compare it with the lifetime that

23  Johnny Mize has lived.  Johnny Mize is a good son.  He's a good

24  husband.  He's been married 13 years to his wife Jennifer.

25  She's here.  You'll hear from her.  He's a good brother and

1    he's a good uncle.  And the court has letters from not just his

2    mom, his dad, brother, sister, but from his in-laws talking

3    about what kind of husband he was to Jennifer -- or is to

4    Jennifer.

5         And I also ask the court to consider that Johnny Mize,

6    as we submitted to the court, never had it easy.  Growing up at

7    an early age he was diagnosed with a learning disability and

8    was placed in special education and he remained in special

9    education until he finished ninth grade and left school.  But

10   he didn't make it -- I might not have made his mark in

11   academics, but he made his mark in his hard work ethic.

12        The court should be aware that he was employed at AAON

13   Corporation as a night supervisor.  He also worked for his dad

14   as a commercial and residential remodeler, and the court has

15   seen the pictures of the before and after of the work he did.

16   And it's no surprise there for that on this holiday at 10:00 or

17   11:00 in the morning, what is Johnny Mize doing?  He's working

18   on this tragic, unfortunate, terrible day.

19        So when the court looks at the factors under 3553(a), I

20   would bring the court back to the number one factor of 3553(a).

21   It couldn't be more relevant in this case.  The facts and

22   circumstances of the offense and the history and

23   characteristics of the defendant, that's factor number 1 under

24   3553(a).  And, boy, do they speak volumes in this case when you

25   look at the facts of this case, someone who's at their house on

1    July 4th working, clearly did something wrong, but clearly not

2    intending to do something wrong that day when they woke up, and

3    then the life that they've lived both before this incident and

4    after this incident.  So I ask the court to view those factors

5    cumulatively in this case in support of our request for a

6    variance.

7          One last point I'd like to make, Your Honor, before I

8    would have some people speak on Mr. Mize' behalf.  The

9    government does make an argument concerning the 25-year state

10   sentence and I would like to comment on that.

11         THE COURT:  Yes.  I think that's very appropriate

12   here.

13         MR. MCHUGH:  Okay.  First and foremost, Your Honor,

14   that conviction was thrown out under the *McGirt* decision.

15   However, before it got thrown out, there were a number of

16   direct-appeal issues pending concerning the trial itself, the

17   validity of the verdict, that were never ruled upon because

18   once *McGirt* came down, the sentence was vacated.  So the

19   conviction there was under significant appeal, I would say to

20   the court, and issues were raised concerning this verdict.

21         Also --

22         THE COURT:  Well, the truth is, as I think about it

23   for this court's purposes it has to be concerned as a

24   nullity --

25         MR. MCHUGH:  Yes.

1    THE COURT:  -- right?

2    MR. MCHUGH:  Yes.  And also, Your Honor, from a

3    legal standpoint, I looked at 3553(a), went through -- you

4    know, sometimes we just take for granted these factors.  You

5    read through them and I could not see a factor where a prior

6    sentence that had been vacated would fit in a factor that you

7    could consider.

8    THE COURT:  Well, and it shouldn't.  And honestly,

9    as a former state judge, I honor jury decisions and my

10   predilection is to first go there, but I think it would be

11   error for me to do so.

12        I mean, I have a responsibility to look at the

13   guidelines, the guideline sentence, and 3553(a) factors.  And I

14   don't think as you speak here, I don't think I can consider the

15   state court sentence.  I mean, part of me wants to honor what a

16   state court jury did but I can't do that.  I think that would

17   clearly be in error; right?

18   MR. MCHUGH:  It definitely would be error if the

19   court were to rely on that.  Because I did not -- I would argue

20   I did not see that in the factors that the court -- as we know,

21   the appellate courts are very clear stating the reasons for the

22   sentence and whatever happened at the sentencing.  That would

23   not be an appropriate factor.

24   THE COURT:  But do you have a sense, though, of why

25   the jury gave him a 25-year sentence?

1        MR. MCHUGH:  Here's what I would say to that.  So
2   from a legal standpoint, I think we've addressed that.  I don't
3   think the court should consider it.

4        Let's look at it from a practical standpoint, Your
5   Honor.  From a practical standpoint, this jury never heard --
6   never had a presentence report, as Your Honor has the benefit
7   of.  It never had any character letters written on behalf of
8   Mr. Mize.  It never had his educational history and what we now
9   know about his educational history and his learning disability.
10  It never had his employment history that we now know about.  It
11  never had his family support.  Obviously, they knew he was
12  working on that day, but Your Honor has seen the letters.  The
13  jury never saw any letters in support of Mr. Mize.  And,
14  frankly, Your Honor, Mr. Mize didn't testify at the trial.
15  They've never heard from him.  And Your Honor is going to hear
16  from Mr. Mize today.

17       So there are so many things that the jury did not hear
18  from.  And as I said from the beginning, I really think from a
19  legal standpoint, given the significant appellate issues that
20  were never ruled upon because of *McGirt*, that this court should
21  not rely on that sentence.  We all know what a valid sentencing
22  proceeding is.  In federal court, the Congress and the
23  appellate courts are so clear of all the factors that have to
24  be presented to the judge.  And I would suggest to you, Your
25  Honor, that jury had none of those factors, it really did not

1    have those factors.

2           And so can I explain what was in their heads on that

3    day when that sentence was imposed or recommended?  No, I

4    cannot.  But do I know what wasn't in front of them and it's

5    significant.

6           Your Honor, at this time, if it would be appropriate,

7    or do you want to hear from the government or would you hear

8    from our character witness on behalf of Mr. Mize?

9                THE COURT:  Well, I usually turn to Mr. Mize.  But

10   any objection to having another individual speak for the

11   defense?

12               MR. HEATHERMAN:  No, Your Honor.

13               THE COURT:  Very well.

14               MR. MCHUGH:  We have two.  Thank you, Your Honor.

15               MS. CHRISTENSEN:  Your Honor, I'm going to ask two

16   of Mr. Mize' family members to come up and address the court.

17   First, his father Johnny Mize, Sr.

18          All right.  Mr. Mize, could you state your name for the

19   court?

20               MR. MIZE, SR:  Johnny Edward Mize, Sr.  I'm the

21   father.

22               THE COURT:  That's pretty evident.  There's a little

23   bit of resemblance there.

24               MS. CHRISTENSEN:  And you are here today on

25   Mr. Mize' behalf?

1      MR. MIZE, SR:   Yes.

2      MS. CHRISTENSEN:   And is there anything you would
3   like the judge to know before imposing the court's sentence?

4      MR. MIZE, SR:   Yes, I do.   Thank you, Your Honor.
5   It's hard to sum up my son's life but I've tried to put
6   together some notes that would just give you an outline of who
7   he was as a kid, as a young adult, leading all the way up to
8   and since this incident that can show that he's been
9   consistently the same character-wise person.

10      He had a hard time with school but he was very
11   intelligent.   He was very creative and independent.   He could
12   create and figure out things, that he could figure out how it
13   works, and then he could figure out ways to even do it better,
14   taking cabinets off the doors as a one-year-old, just all kinds
15   of stuff.   So he was creative and he knew how things -- he
16   could figure out how things worked.

17      As he got older, he was always tall.   I don't know
18   where he got the height.   You can see my wife back there.
19   We're both short but he sprouted up quick.   But even as a young
20   child, he was tall, and because of his height, in school he was
21   treated almost like they thought he should have been older and
22   so it caused a lot of conflicts with him.

23      Well, he finally decided he didn't want to go to school
24   anymore so I told him he was going to have to work, he's not
25   going to just sit home.   So I put him to work at that time

1   working on the Atlas Life building here in downtown Tulsa and

2   the Wright office building downtown remodeling several floors

3   of both of those buildings.  Shortly after we started -- he

4   started over there, all the crew kind of navigated to him when

5   I wasn't there looking for directions on what to do, how -- you

6   know, they immediately took to him as he was their boss when I

7   wasn't there.  And he was just 16 years old but he was tall,

8   already had facial hair and everything.

9          So, you know, after finishing those jobs, he decided he

10   didn't want to work for daddy no more, he wanted to go get

11   another job.  So he went out in the workforce and he was out

12   there quite a few years.

13          Well, finally, you know, due to my health and my age, I

14   had started a business and it was going good and I decided to

15   put him to work, and my youngest son, for them to take this

16   business over and then they wouldn't have to work for anybody

17   else the rest of their lives.  And he excelled at it.  He

18   learned it, picked it up, he was good, and the customers loved

19   him, I mean, they just adored him.  They loved calling and

20   having him come out and look at other projects that they had.

21   So, you know, Michael and Johnny were -- they were running the

22   business.  I was almost out of it.

23          Well, then July the 4th, 2017, happened.  At that time

24   everything changed, you know.  Due to that day a young boy lost

25   his life, a young man's life was changed, and two families were

1    destroyed and we'll never recover from that.  And it's sad.  It

2    took John John -- we call him "John John" -- it took him about

3    three or four weeks before he felt comfortable enough to go

4    back to work and so he went back to work.

5           Multiple times I had customers call me and my youngest

6    son, Michael, he broke down on the job site, and I would have

7    to leave, go track him down, calm him down, because he was an

8    emotional wreck over this incident.  So I finally convinced him

9    to get counseling.

10          Well, he didn't have health insurance because the

11   business wasn't good enough -- going quite good enough to pay

12   for health insurance for the two of them and he was too old to

13   add to my insurance, so we agreed that we could afford once a

14   month for counseling.  So up until trial, that's what he did,

15   he went to counseling.  Well, those sessions lasted until then.

16          So finally he just -- he couldn't stay focused in

17   running the business and doing that work.  So he decided to go

18   do an assembly-job work because it didn't take as much focus

19   for him and everything just assembling bicycles and lawnmowers

20   and stuff like that for Wal-Mart and Target, Lowe's and places

21   like that.  Well, he went and did that and he did that plum up

22   until trial.

23          Since this incident, as you can see, my wife and I have

24   been -- you know, we lost a business because Johnny was -- I

25   mean, he was the heart of it.  You know, he was the one that

1    really excelled at it and was doing it exceedingly well.  So we

2    lost our family business.

3         Since that time, my wife and I have been terrorized on

4    our property.  Before the original trial, I put cameras up

5    around my property because that's where the fireworks stand was

6    on my property.  Well, before the trial, I caught on video one

7    of that family members breaking out windows on my wife's car.

8    Turned it over to the police.  They charged him, dropped the

9    charges because they had a more serious charge against him, so

10   they just dropped it.

11        THE COURT:  Well, now, that is wrong obviously but

12   it doesn't bear on this sentence that I'm charged --

13        MR. MIZE, SR:  It's just leading up to -- I'm having

14   to sell my house now to get out of there.  They set -- after he

15   accepted the plea deal here, they set my van on fire on video.

16        THE COURT:  I understand.  As I say, that's

17   absolutely wrong, but it doesn't bear on the sentence that I

18   have to impose today.

19        MR. MIZE, SR:  Okay.  I understand, Your Honor.

20        THE COURT:  Yes, sir.

21        MR. MIZE, SR:  But my wife had to leave so we're

22   selling our house.  So this event has cost both families

23   dearly.

24        Since Johnny was taken into custody in January of 2019,

25   where he was at we've not had much opportunity to visit him,

1    you know, so most of our visits with him has been over the

2    phone.  The few in-person visits that we've been able to have

3    because of COVID and everything going on, you know, and plus

4    regular lockdowns for the state, you could tell he was still

5    troubled and he was trying to get counseling while he was in

6    there.  In the state facility, he just couldn't get it and

7    stuff.  Well, over the phone, you can tell he's breaking down,

8    you know, he's bothered, and spending too much time just

9    sitting in a cell getting too much time to just dwell on it.

10          So, you know, I just want to point out he's been this

11   type of person that is sensitive and soft, but he's also caring

12   and he works and he doesn't mean harm to anybody.  So if he

13   gets out, he has plenty of family members.  He has tons of

14   friends.  Everybody in the world will be helping him to get

15   through this.  He's just going to have to get in a place where

16   he can get counseling to help him deal with something that's

17   happened in his life that's hard to process for someone who is

18   as caring as he is.  He practically raised one of his nephews.

19   So he's that type of person and he's been that way all of his

20   life.

21          So, Your Honor, the man whose life you're looking at

22   today covers a wide area, and I just hope that I've been able

23   to share with you some of the things that represents him as a

24   person from the time he was born until today.  His actions are

25   unfortunate and I know he regrets it because it's why he keeps

1  breaking down.  But that lasted less than three minutes in his

2  lifetime.  It doesn't really represent who he is.  It just

3  represents an action he took in a split moment.

4          Thank you, Your Honor.

5          THE COURT:  Thank you, sir.

6          MS. CHRISTENSEN:  Your Honor, if it's all right, I

7  would also ask Jennifer Mize, Mr. Mize's wife, to read a letter

8  to the court.

9          THE COURT:  Good afternoon.

10         MRS. MIZE:  Hello.

11         MS. CHRISTENSEN:  Just state your name for the

12 court.

13         MRS. MIZE:  I'm Jennifer Mize, the wife of Johnny

14 Mize, II.

15         MS. CHRISTENSEN:  And you're here today on his

16 behalf?

17         MRS. MIZE:  Yes.

18         MS. CHRISTENSEN:  And is there anything you would

19 like the judge to know before imposing the sentence?

20         MRS. MIZE:  Yes.  I would like to read my statement.

21 I just wrote it down.  I've never done anything like this

22 before.

23         THE COURT:  That's fine.

24         MRS. MIZE:  I'm Jennifer Mize.  I'm the wife of

25 Johnny Mize.  My profession is a Reiki master.  It is a type of

1    spiritual healer.  I've known my husband for 15 years and we've

2    been married for 14.  We met at an apartment in Sand Springs,

3    Apple Creek, where both of our parents lived there.  And I

4    acknowledge that I'm here to speak on the character of Johnny

5    Mize, my husband, and I'm aware and I support that he is

6    holding himself accountable for voluntarily manslaughter of

7    Jake Ulrich.  I also want to thank you for the opportunity of

8    letting me speak on the character of him.

9         I want to start at the beginning when we first started

10   dating to give you an example of his loyalty.  He was working

11   at AAON, a metal shop in Tulsa, when we first met working the

12   night shift, 12-hour shifts.  Shortly after we started dating,

13   I had mentioned that we were talking about -- and we were

14   talking about how I've never been to the ocean.  And he saved

15   money, figured out our bills and our car payment, set himself

16   up some vacation at work, and we drove to Galveston so I could

17   see the ocean.  It was the most -- it was one of the most

18   memorable things of my life.

19        Also, I want to mention everything that I've learned as

20   an adult has some -- has mostly come from my husband, as far as

21   fixing things to knowing when to stop and breathe, and I know

22   that we are here for him doing a violent act but I really want

23   to emphasize that my husband has been a calm -- my calm my

24   whole marriage.

25        I want to go to a time when he wanted to not do the

1  night shift anymore and he didn't want to work at the metal

2  shop, and we talked and we had saved up money in his 401(k) and

3  we were so young at the time we didn't really even see the

4  point of the 401(k) at that time.  And so we decided to cash it

5  out and buy a travel trailer and moved it to my mom's.  Then a

6  little bit after living there, we ended up moving it to his

7  parents' house to do the family business with the resurfacing

8  and we thought it would be easier to just be living there.

9  When we started living there, he had really loved that we were

10  going to have a family business.

11      Another example of him and his work ethic is as far as

12  him being ready to work before we moved to his parents', we

13  were living with my mom and he had broke his leg.  While he was

14  still healing, he decided -- we were -- when he was still

15  healing, we decided to move to his parents' and we had had two

16  dogs at the time.  He had built a pen for the animals outside

17  because they mostly liked to be outside, and he was very

18  determined on getting that pen done and he worked through his

19  pain.

20      I also want to point out that through our whole

21  marriage he has also had a job.  Whether he was working at a

22  temp agents or when we started doing the family business, he

23  was always working.

24      I want to move to the growth that has happened since he

25  has been in prison.  He has been very patient and attentive to

1    listening to my problems.  We work through things through with

2    -- and work things through with me.  Ever since the lockdown,

3    we haven't been able to touch or visit and most people would

4    think that that would hurt a marriage, but this has only made

5    us stronger in our communication and our loyalty towards each

6    other and our compassion for each other has grown tremendously.

7         I know that there has been many times that he has

8    called me and I've had a bad day or I don't feel good or

9    whatever it may be, and he is always a listening ear.  He has

10   helped me in my grieving of my dad.  He had passed when I was

11   on my way to see my husband.  We also talked about plans for

12   when he gets home.  We talked about how we think since our

13   relationship has been just talking and we haven't lived

14   together, we need to seek counseling so we will be able to have

15   an easy transition.

16        This whole situation has brought us on a spiritual

17   journey together as a married couple, and that is the reason

18   why I took my spiritual classes to get my Reiki masters and

19   it's truly saved my mental health.  That is part of our plan

20   when we gets home that I'm going to have online classes to do

21   with the public.  I plan on very soon having a business.  Me

22   and him talked about this on several occasions and the support

23   he has shown me is amazing.  He even asked me to send him books

24   so he can better understand what I do and so it can help him

25   heal.

1    I know that my husband has really had some inner work

2  to do since he has been in prison, and I know and he knows his

3  boundaries have to be set for the future.  I know that every

4  day he talks about getting his license, getting his GED, and

5  helping me start my business.  He also was worried about his

6  parents' health, my mom's health, and the fact that he wants to

7  be able to help them when they retire.  The tragedy that

8  happened that day has forever changed so many lives, and he has

9  stated to me that he wishes he could go back and do everything

10  different.

11    I now want to start a little bit on the remorse that my

12  husband has felt since 2017.  A lot of emotions from this case

13  have been under lock and key and between a husband and a wife.

14  I want to start back when this happened when my husband and me

15  found out how old Jake was and it hit us a soft spot in our

16  hearts because the amount of love he gives to our nieces and

17  nephews.

18    This would have never -- this would have never happened

19  in our minds.  My husband is somebody that shows no anger.  He

20  definitely shows sadness and we can see in his face, and the

21  facts that he is -- the fact that he felt like he has to keep

22  on working and keep on trying to figure out how to make himself

23  better is a sign of how much he feels it in his heart and it is

24  also honestly broken.  I know how my husband copes and it

25  usually is just to keep on moving.

1       Now since he has been incarcerated, he has had no

2    choice but to look within and find the darkness and turn it

3    into light.  He knows he can no longer push down the emotions

4    and they have to be dealt with.  The amount of tears that has

5    came out of both of us is unimaginable and honestly has been

6    the most gut wrenching thing that we have been through as a

7    couple and he has been through as a person.  He also

8    understands the amount of tears that has came out of everyone

9    in this situation, and we both are very sorry that words can't

10   even sound right.

11       I have talked to my husband every day our whole

12   relationship.  We have talked every day on the phone since he

13   has been incarcerated except for, you know, the lockdowns.

14   It's been over a little over three years.  I can tell from his

15   first word when he answers the phone the amount of sadness and

16   guilt, so that he has to talk and we -- so that he has and we

17   talk about what we could do to fix these emotions and we talk

18   -- he has took some classes on the tablet in prison that helps

19   him with anger management and how to cope.  He has been --

20   there has been days where he can feel these emotions of sadness

21   and guilt, so he specifically calls me so we can talk it out

22   and he can feel everything that he feels and we can go about a

23   his day and not let the emotions take over.

24       My husband has been very open to very unconventional

25   ways of dealing with stress.  He mediates and looks for little

1    things to give him hope and that there's a light at the end of

2    the tunnel.  We also plan on having group talks with people

3    with similar backgrounds and situations where violence has hurt

4    people's lives.  I know our story can help somebody's life in

5    young people and adults in our community.  I know that he

6    thinks about how somebody's life has ended and that they do not

7    get to feel life anymore because of an action that he has done.

8    I know that he plans on living every day of his life giving

9    thanks and being able to grow and be a better man for this

10   world, for our nieces and nephews, and for any other people

11   that he comes across to give them inspiration to be a better

12   person.  Even if something bad happens, they can come together

13   in the end and be stronger.  And we have talked about holding

14   himself accountable for his actions in a big way is helping him

15   cope and grow from -- and it has definitely made a difference.

16       I want to say my part as his wife sorry to everybody

17   that this has affected and I send my love and prayers to

18   everybody involved.

19       Thank you, Judge, and I appreciate you listening to my

20   words.

21           **THE COURT:**  Thank you.

22           **MRS. MIZE:**   Thank you.

23           **THE COURT:**  Mr. Mize, I'd be pleased, sir, to hear

24   any statements that you have on your own behalf.

25           **THE DEFENDANT:**  Your Honor, I would just like to

1   thank my family for being here.

2           **THE COURT:**  Sure.  And, Mr. Mize, if you could come

3   up to the podium, please.

4           And I, too, want to thank everyone for being here.  As

5   the attorneys will attest, it is all too often that no one is

6   here to support a defendant.  So you've obviously done the

7   right thing by being here and I appreciate your support for

8   Mr. Mize.

9           Go ahead, sir.

10           **THE DEFENDANT:**  All right.  I just wrote a little

11   something down.  I just want to thank my family for being here

12   for the support.  Thank you for your attention.  I would like

13   to apologize to the family, the victim's family anyways.  I

14   would like to say sorry to the victim's family for the choices

15   I made.  I didn't have the right to take anyone's life that day

16   and I take full responsibility for my action.

17           I keep hearing prison is hard time, but the way I see

18   it knowing I killed Jake hurts -- haunts me every night and

19   that this is the hardest time I will do because I have to live

20   with that for the rest of my life.  I wish I could take it back

21   but it's too late.  I'm sorry for that.

22           Since I've been incarcerated, I've been programming,

23   self-educating, I've successfully completed 43 programs that

24   are available on the tablet like coping skills, anger

25   management, peace education program.  These help me a lot.

1    When I'm released, I plan on obtaining my GED and going

2  to college to help my wife with her business a little bit

3  better.  Hopefully, I can make it a better than the one I had.

4  I plan on being more of a positive influence on people, younger

5  and older people.  Thank you.

6         **THE COURT:**  Thank you, sir.

7         **THE DEFENDANT:**  I don't plan on coming back.  So --

8         **THE COURT:**  Thank you.

9         **THE DEFENDANT:**  That's it.

10        **THE COURT:**  Mr. Heatherman.

11        **MR. HEATHERMAN:**  Yes, Your Honor.  The government

12  largely stands on Ms. Reininger's response but something struck

13  me as we're sitting here.

14        The government doesn't doubt any of the positive things

15  that have been said about the defendant or his sincerity in his

16  apology.  But just to shift the focus back to the victim, it

17  was touching to see this family, like you just mentioned, Your

18  Honor, to be here to support him.  By all accounts, it seems

19  like a strong American family, hard-working Oklahomans, and

20  it's nice to see it.

21        But as I'm sitting here, I noticed that, you know, the

22  victim never had that.  We tried to call the victim's family.

23  He was raised -- at this point his guardian is his

24  ninety-year-old grandma.  She would hang up the phone on us.

25  He has a cousin that picked him up and put him in this

1    disastrous situation by all accounts.  He never had the family.

2    This family you see here, he never had it.  And that's sad

3    because you're a kid and he wasn't given that.

4         But the worst part about it was, he was deprived of the

5    opportunity to create one of his own, to work hard, to grow up,

6    to be a husband, to be a father, and he doesn't have anyone to

7    speak for him so it's up to me.  And that was deprived from him

8    and that's why we're asking in this memo for the top end of

9    that guideline range to find justice for him and for everything

10   that was deprived that day.  So 78 months is our

11   recommendation, Your Honor.

12        **THE COURT:**  Thank you, sir.  And for the record, do

13   we have any victims' representatives who would wish to speak

14   today?

15        **MR. HEATHERMAN:**  All the victims have been notified

16   and none are present, Your Honor.

17        **THE COURT:**  Very well.  Thank you.

18              *(Discussion held off the record)*

19        **THE COURT:**  The court notes that the defendant

20   previously entered a plea of guilty to the single-count

21   information before a United States magistrate judge.

22        Mr. Mize, at the time of your plea, did you consent to

23   the magistrate judge taking your guilty plea, sir?

24        **THE DEFENDANT:**  Did I consent?

25        **THE COURT:**  Yes.

1    **THE DEFENDANT:**  Yes.

2    **THE COURT:**  Are you aware of any facts or

3    circumstances that have changed since the time of your plea

4    that would affect the validity of your guilty plea?

5    **THE DEFENDANT:**  No.

6    **THE COURT:**  Very well.  You may be seated.

7    The court finds that the defendant's plea of guilty to

8    the single-count information before a United States magistrate

9    judge was voluntary and supported by the factual record.

10   Therefore, the court affirms the finding of guilt and accepts

11   the guilty plea that was made before the magistrate judge.

12   The court notes for the record that neither the

13   plaintiff nor the defendant has filed an objection to the

14   presentence investigation report.  The court further notes that

15   the defendant's plea of guilty to the single-count information

16   was made pursuant to a written plea agreement at docket No. 72.

17   Pursuant to Rule 11(c)(1)(C) of the Federal Rules of

18   Criminal Procedure, the parties agree that the appropriate

19   disposition in this case is a sentence not to exceed 78 months

20   imprisonment.  Based upon the factors listed in the plea

21   agreement, the information provided by the parties, including

22   the defendant's sealed motion at docket No. 44, as well as a

23   review of the presentence investigation report, the court finds

24   that the stipulation agreed to by the parties is reasonable and

25   does not undermine the statutory purposes of sentencing.

1    Therefore, the court formally accepts the 11(c)(1)(C) plea
2    agreement.
3          I did have one question, Mr. McHugh.  Why was docket
4    No. 44 sealed?  Was it because of the HIPAA information
5    contained therein?
6          **MR. MCHUGH:**  The presentence -- or our sentencing
7    memo, Your Honor?
8          **THE COURT:**  Yes.
9          **MR. MCHUGH:**  We sealed it out of an abundance of
10   caution because of the school records which included a
11   psychological review.
12         **THE COURT:**  That's what I figured.  I thought it was
13   -- which is the psychological review would be a HIPAA record?
14         **MR. MCHUGH:**  Yes.  Exactly.
15         **THE COURT:**  All right.  Thank you very much.
16         The court has reviewed the defendant's sealed motion
17   for nonguideline sentence and the sentencing memorandum at
18   docket No. 44, with the attached character letters and family
19   photographs, requesting a sentence of time served, which I
20   understand to be around 38 months.
21         The court has also reviewed the government's response
22   in opposition at docket No. 46 requesting that the court deny
23   defendant's motion and impose a sentence at the high end of the
24   guideline range.
25         This case included the defendant, a non-Indian,

1   shooting and ultimately leaving for dead J.U., an Indian

2   juvenile.  Based upon the nature and circumstances of the

3   offense, the court finds that the factors cited by the

4   defendant failed to separate him from the mine run of

5   similarly-situated defendants to a degree that warrants a

6   variance.  Accordingly, the defendant's sealed motion for

7   nonguideline sentence at docket No. 44 is denied.

8       The court recognizes that the guidelines are advisory

9   and are not mandatory but has considered the guidelines, along

10  with all of the factors set forth in Title 18 United States

11  Code Section 3553(a), to reach an appropriate and reasonable

12  sentence in this case.  In determining a sentence, this court

13  has considered the nature of the offense, the defendant's

14  criminal history, and his personal characteristics.

15      This case involved the defendant, a non-Indian male,

16  shooting and killing J.U., an Indian juvenile, when J.U.,

17  together with Jack Ulrich, stole $600 worth of fireworks.

18      The defendant has a limited criminal history and a

19  history of marijuana use.  Based on these factors, a sentence

20  within the advisory guideline range will serve as an adequate

21  deterrent to this defendant, as well as others, promote respect

22  for the law, provide just punishment for the offense, and

23  provide protection for the public.  Sentencing disparities

24  among defendants were considered in determining an appropriate

25  sentence in this case.

1          A term of supervised release is appropriate with

2    special conditions based upon the aforementioned factors and

3    will allow the defendant time to reintegrate into the community

4    upon his release from imprisonment and be monitored for future

5    law violations.   Restitution is mandatory but has not been

6    requested.

7          Mr. Mize, if you'll rise, please.   In accordance with

8    applicable law, this court hereby imposes the following

9    sentence:

10          It is and order and judgment of this court that the

11    defendant, Johnny Edward Mize, is hereby committed to the

12    custody of the Bureau of Prisons to be imprisoned for a term of

13    78 months.   Based upon the defendant's financial profile, as

14    outlined in the presentence report, the court finds that the

15    defendant does not have the ability to pay a fine, and

16    therefore, no fine will be imposed.

17          Upon release from imprisonment, the defendant shall be

18    placed on a term of supervised release for a period of three

19    years.   Should that term of supervised release be revoked, an

20    additional term of imprisonment of up to two years could be

21    imposed at each revocation.

22          And you may be seated, sir.

23          Immediately upon the defendant's release from

24    confinement, but in no event later than 72 hours thereafter,

25    the defendant must in report in person to the probation office

1   in the district where he is authorized to reside.  While on

2   supervised release, the defendant must not commit another

3   federal, state, or local crime.  The defendant must not own,

4   possess, or have access to a firearm, ammunition, destructive

5   device, or other dangerous weapon.

6           And, frankly, Mr. Mize, that's the easiest crime for an

7   assistant U.S. attorney to prosecute because all they have to

8   show is you've been convicted of a federal felony and that

9   you've possessed a firearm.  It doesn't mean you have to have

10  it in your hand.  Possession can be far broader than that.  So

11  be sure to stay as far away from firearms as possible.

12          The defendant must, at the direction of the U.S.

13  probation officer, cooperate with and submit to the collection

14  of a DNA sample for submission to the combined DNA index

15  system.  Further, the defendant must not possess a controlled

16  substance and must refrain from any unlawful use of a

17  controlled substance.  The defendant must submit to one drug

18  test within 15 days of release on supervised release and at

19  least two periodic drug tests within 120 days for use of a

20  controlled substance.

21          The defendant must comply with the standard conditions

22  that have been adopted by this court and must comply with the

23  following additional special conditions:

24          Number one, the special search and seizure condition;

25  and number two, the special mental health condition.

1        It's further ordered that a $100 special monetary

2   assessment be paid immediately to the U.S. Court Clerk for the

3   Northern District of Oklahoma.

4        Mr. McHugh, I know you're aware of your obligation to

5   consult with Mr. Mize regarding the advantages and

6   disadvantages of perfecting an appeal and making a reasonable

7   effort to ascertain whether Mr. Mize desires to perfect an

8   appeal.  In order for the court to ensure that the record is

9   clear that you've complied with those obligations, I'm

10  directing you now on the record to file within 14 days after

11  the judgment is filed either a notice of appeal or an affidavit

12  signed by you and the defendant advising this court that you've

13  consulted with him and that he's advised you that he does not

14  wish to perfect an appeal.  Very well?

15        **MR. MCHUGH:**  Yes, Your Honor.

16        **THE COURT:**  And I believe the indictment and the

17  superseding indictment should be dismissed as against Mr. Mize?

18        **MR. HEATHERMAN:**  Yes, Your Honor.

19        **THE COURT:**  Very well.  Both the indictment and the

20  superseding indictment against Mr. Mize are dismissed.

21        Mr. Mize, the reason I imposed a sentence of 78 months

22  -- and I know it was a terrible day and continues to be a

23  terrible day -- but having left this individual in the truck,

24  and he may have been dead even then, he was shot in the chest,

25  but no 911 call was made, left him in the truck, he was found

1   by a passerby and her children, as I understand it.  The facts
2   and circumstances here merit the 78 months.  I suspect that may
3   have been what prompted the state jury to impose a sentence of
4   25 years in this circumstance.  I mean, it does strike me as a
5   rather high sentence for this crime, but I suspect that may
6   well have been having left that young man in the truck.
7       I think you deserve an explanation of why I went high
8   end.  And believe me, I considered where within the guideline
9   range to impose that sentence and that's why I wound up at that
10  high end.
11      You're fortunate insofar as this is the only case that
12  I've had, which is a *McGirt* case, where the sentencing
13  guideline range is actually lower in federal court than the
14  defendant is exposed to in state court.  In most cases, these
15  *McGirt* cases involving an Indian, either as a defendant or as a
16  victim, the sentencing guideline range is significantly higher.
17  So you've been smiled upon from above here by virtue of the
18  *McGirt* case.  As I say, I'm only one of three and a half judges
19  here in this district but this is the first case in over two
20  years of *McGirt* cases where that's been true.
21      You're to be commended for your character and your work
22  at Cimarron.  The letter that I received and read today is
23  extraordinary.  I don't get many letters like that.  And it's
24  very persuasive as to the quality of your character frankly.
25      The whole situation's tragic.  There is no doubt.  I

1    wish you well.  I wish you a speedy return to your family.

2         Is there anything further?

3              MR. HEATHERMAN:  No, Your Honor.  Thank you.

4              THE COURT:  Mr. McHugh.

5              MR. MCHUGH:  Your Honor, yes.  A couple things

6    actually.  Number one, in the plea agreement that we had

7    presented to Your Honor, it was agreed that the sentence would

8    be concurrent.

9              THE COURT:  Yes.  That's exactly right.  In fact, I

10   wrote that in and it will be part of the judgment.

11   Specifically, you said 78 months imprisonment to run concurrent

12   with any other state sentence for the same conduct.  Now, he'll

13   be given credit by BOP for the 38 months --

14             MR. MCHUGH:  Okay.

15             THE COURT:  -- right?

16             MR. MCHUGH:  That is the concern we had.  We had

17   cited the guideline 5G1.3(b).

18             THE COURT:  I am certain he will be and he should

19   be.  Ms. Toppah.

20             PROBATION OFFICER:  Yes, Your Honor.  So the 38

21   months hasn't been applied to another sentence because that

22   case was vacated so it will be automatically applied to this

23   case.

24             THE COURT:  Right.  And I'll be certain here to

25   state that it -- well, is it even -- is it even appropriate to

37

1  say, Ms. Toppah, to run concurrent with any other state

2  sentence for the same conduct because that state sentence is a

3  nullity?

4          PROBATION OFFICER:  That's right, Your Honor.

5          THE COURT:  So maybe I should say "with credit for

6  the time served in state custody."

7          PROBATION OFFICER:  You can say that, Your Honor,

8  but it will be automatic.  So because this time, this 38 months

9  that he's done so far --

10         THE COURT:  Yes.

11         PROBATION OFFICER:  -- has not been credited to

12  another sentence because that sentence was vacated, the state

13  case was vacated, it will be automatic.

14         THE COURT:  That's always been the case in these

15  *McGirt* matters.

16         Mr. McHugh, if there's any problem whatsoever, let me

17  know and we'll address it.  But our understanding -- and I'm

18  sure the government's understanding -- is that he gets credit

19  for the 38 months that he's served.

20         MR. HEATHERMAN:  That's our understanding.  That's

21  part of the bargain that we had, yes, Your Honor.

22         THE COURT:  Correct.

23         MR. HEATHERMAN:  Yeah.

24         MR. MCHUGH:  Okay, Your Honor.  And that is why we

25  had cited the guideline provision.  In case the BOP did not

1    give him credit, the guideline provision allows for the court

2    to make an adjustment.  So if the court's stating on the record

3    that he should be given time credit for all his time spent in

4    the state, which there was no other charge, so it all goes to

5    this offense --

6              THE COURT:  Well, I think in an abundance of

7    caution, I'll say "with time credited for time" -- "with credit

8    for time served in state custody."

9              MR. MCHUGH:  Okay.

10             THE COURT:  Yeah.  See, the difficulty or the danger

11   with me applying that guideline provision is that he's not

12   entitled to double credit.

13             MR. MCHUGH:  And digging deeper into the guidelines,

14   when you look at the comment C to that guideline, it directs

15   the court to specifically state, if you're giving an

16   adjustment, as to what time you're giving the adjustment for,

17   from when to when, obviously the state time in this case.  So

18   the court could give an adjustment, state on the record that

19   I'm giving an adjustment from 78 minus the time in state

20   custody, and then the BOP will not give him double-credit.  I

21   believe that's why the guideline comment specifically directs

22   the court to state on the record what the adjustment is for.

23             THE COURT:  What the credit is for?

24             MR. MCHUGH:  So it would be 5G1.3, and then

25   application of subsection (b), note C, imposition of sentence.

1    THE COURT:  Well, and then -- but that presumes that

2    I'm crediting or I have an exact --

3    MR. MCHUGH:  Yes.

4    THE COURT:  -- calculation of the time served which

5    I do not.

6    MR. MCHUGH:  And it also -- that's correct, Your

7    Honor.  And it also presumes that he's not getting credit from

8    the BOP in order for this guideline to apply.  So if the court

9    is stating on the record that he's getting credit from the BOP

10   for the time spent in state custody, then I think that should

11   be sufficient.

12   THE COURT:  I think so.

13   MR. MCHUGH:  But the double-credit issue, I think,

14   is corrected by the court putting in the judgment and

15   commitment what the adjustment was based on, if the court were

16   going to order an adjustment.

17   THE COURT:  And it was also an involuntarily

18   manslaughter in state court; correct?

19   PROBATION OFFICER:  It was manslaughter in the first

20   degree in the heat of passion, I believe, Judge.

21   THE COURT:  All right.  Let me take a look here.

22   PROBATION OFFICER:  Yes, that's correct.

23   THE COURT:  Manslaughter first degree-heat of

24   passion?

25   PROBATION OFFICER:  Yes, Your Honor.

1      **THE COURT:**  All right.  So we're adding, Mr. McHugh,

2    then "with credit for time served in state custody for his

3    state conviction for manslaughter first degree-heat of

4    passion."  Very well?

5      **MR. MCHUGH:**  Thank you, Your Honor.  That covers it.

6    My last request, Your Honor --

7      **THE COURT:**  Of course, sir.

8      **MR. MCHUGH:**  -- is just if when court is adjourned,

9    if Mr. Mize would be given a minute or two to be able to

10   converse with his family, if that's appropriate.  He hasn't had

11   any in-contact viewing of them in a couple years.  So --

12     **THE COURT:**  I defer to my U.S. marshals and I will

13   -- you can do whatever they will allow.

14     **MR. MCHUGH:**  Thank you.

15     **THE COURT:**  Yes, sir.  All right.  Thank you very

16   much.  We are adjourned.

17             *(The proceedings were concluded)*

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3

4            I, Brian P. Neil, a Certified Court Reporter for the

5    Northern District of Oklahoma, do hereby certify that the

6    foregoing is a true and accurate transcription of my

7    stenographic notes and is a true record of the proceedings held

8    in above-captioned case.

9

10           I further certify that I am not employed by or related

11   to any party to this action by blood or marriage and that I am

12   in no way interested in the outcome of this matter.

13

14           In witness whereof, I have hereunto set my hand this

15   2nd day of May 2022.

16

17

                                    s/ Brian P. Neil
18                          _____

19                                  Brian P. Neil, RMR-CRR
                                    United States Court Reporter
20

21

22

23

24

25